**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LOIS PIPER and BRENDA RUARK, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>THE TALBOTS, INC.,<br><br>          Defendant. | Civil Action No.: 1:20-cv-10297-NMG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Lois Piper and Brenda Ruark ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1.    Defendant The Talbots, Inc. ("Defendant") sold personal information about Plaintiffs to list brokers, including for example NextMark, Inc., which in turn sold their information to telemarketers and other aggressive advertisers. As a result, Plaintiffs are being inundated with a barrage of unwanted junk mail and telephone solicitations. By selling Plaintiffs' personally identifiable information ("PII"), Defendant violated Virginia's Personal Information Privacy Act, Va. Code Ann. §§ 59.1-442, *et seq.* (the "VPIPA").

2.    Documented evidence confirms these facts. NextMark's website offers to provide access to the PII of 1,832,331 Talbots customers from the "Talbots Mailing List" at a base price of "$120/M [per thousand]," (i.e., 12 cents apiece).

# Talbots Mailing List

Get Count | Get Pricing | Get More Information

| SEGMENTS | COUNTS THROUGH 01/30/2019 | | POPULARITY: | ▪▪▪▪▪ 100 | |
|---|---|---|---|---|---|
| 1,832,331 TOTAL UNIVERSE / BASE RATE | | $120.00/M | MARKET: | CONSUMER | |
| 183,034 1 MONTH | | $30.00/M | CHANNELS: | | |
| 488,493 3 MONTH | | $25.00/M | SOURCE: | DIRECT MAIL SOLD | |
| 798,743 6 MONTH | | $17.00/M | PRIVACY: | UNKNOWN | |
| 1,237,308 12 MONTH | | $12.00/M | DMA?: | NO | |
| PUBLISHING/MEMBERSHIP BASE $65/M | | $65.00/M | STATUS: | STANDARD PROVIDER | |
| FUNDRAISING BASE $70/M | | $70.00/M | GEO: | USA | |
| **DESCRIPTION** | | | GENDER: | 90% FEMALE | |
| | | | **SELECTS** | | |
| | | | $100+ BUYERS | | $42.00/M |
| | | | $150+ BUYERS | | $52.00/M |
| | | | $200+ BUYERS | | $62.00/M |
| | | | $50+ BUYERS | | $27.00/M |
| | | | $75+ BUYERS | | $32.00/M |
| | | | 1 MONTH HOTLINE | | $30.00/M |
| | | | 3 MONTH HOTLINE | | $25.00/M |
| | | | 6 MONTH HOTLINE | | $17.00/M |
| | | | AVERAGE PURCHASE | | $10.00/M |
| | | | IN HOUSE CREDIT | | $12.00/M |
| | | | INTERNET BUYERS AT POSTAL ADDRESS | | $12.00/M |
| | | | LAST PURCHASE | | $10.00/M |
| | | | MULTI/SINGLE PURCHASE BUYERS | | $12.00/M |
| | | | PRODUCT | | $17.00/M |
| | | | PURCHASE | | $10.00/M |
| | | | SCF | | $10.00/M |
| | | | SIZE | | $10.00/M |
| | | | STATE | | $10.00/M |
| | | | TALBOTS | | |
| | | | ZIP | | $10.00/M |

Celebrating our 70th anniversary this year!        TALBOTS

Established in 1947, Talbots is a leading specialty retailer offering modern classic style that's both timeless and timely, fine quality craftsmanship and gracious service. With a commitment to offer modern classic style for every body, Talbots carries a full range of sizes, including Misses, Petite, Woman Plus and Woman Plus Petite. The Talbots collection includes sportswear, career separates, casual wear, activewear, swim, special occasion dressing as well as a complementary selection of shoes and accessories for "head-to-toe" wardrobing.

**ORDERING INSTRUCTIONS**

- To order this list, contact your List Broker and ask for NextMark List ID #432921 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- 10,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($8.00/M RUN CHARGE)
- PLEASE INQUIRE ABOUT EXCHANGE
- PLEASE INQUIRE ABOUT REUSE
- CANCELLATION FEE AT $100.00/F

| **ADDRESSING** | |
|---|---|
| KEY CODING | $3.00/M |
| EMAIL | $60.00/F |

**RELATED LISTS**
▤ SUNDANCE CATALOG
▤ NORTHSTYLE
▤ WILAND CATALOG/ONLINE BUYERS DATABASE

*See* Complaint Ex. A.

  3.    "NextMark serves buyers and sellers of media."  Its typical sell side customers include "media owners," such as Defendant.[1]

---

[1] https://www.nextmark.com/company/faq/ (last visited May 26, 2020)

4.     NextMark also "helps others to maximize their yield through media sales tools."[2]

5.     One such tool NextMark offers is the ability to publish "data cards," i.e. representations of the data available for purchase.[3]

6.     Defendant also offers access to its "Talbots Wiland Direct Modeled Mailing List" at the same base rate of "$120/M."  The "Wiland Direct Modeled" list allows "Wiland Direct members [to] apply their models to Talbot's names to connect with their ideal customer type for the highest rate of response."  Available Wiland models include, "Best Donor," "Comprehensive Response," and "Long-Term Value."



*See* Complaint Ex. B.

7.     Wiland Direct is a data cooperative.  "A data cooperative allows a company to receive personal information of potential new customers in exchange for submitting information about their current or past customers."  *Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172, 181 (S.D.N.Y. 2017).

8.     The Wiland data cooperative pools "first-party, transaction-level consumer spending data" of "250,000,000 adult U.S. consumers."[4]

9.     The VPIPA clearly prohibits what Defendant has done.  The VPIPA provides:

> No merchant, without giving notice to the purchaser, shall sell to any third person information which concerns the purchaser and which is gathered in connection with the sale, rental or exchange of tangible personal property to the purchaser at the merchant's place of business.

Va. Code Ann. § 59.1-442(A).

10.     Accordingly, Plaintiffs bring this Class Action Complaint against Defendant for its intentional and unlawful sale of its customers' PII in violation of the VPIPA, and for unjust enrichment.

## <u>NATURE OF THE CASE</u>

11.     To supplement its sales revenues, Defendant sells its customers' personal information to data miners and other third parties without providing its customers any notice and without their consent.

12.     Defendant's disclosure of PII are not only unlawful, but also dangerous because they allow for the targeting of particularly vulnerable members of society.  In fact, anyone can buy a customer list from Defendant that contains a number of categories of detailed information.

---

[4] https://wiland.com/about/company-overview (last visited May 26, 2020).

For example, a purchaser could buy a list with the names and addresses of all Talbots customers who wear size 4 and made purchases over $100. Defendant would sell such a list for approximately $172 per thousand customers listed.

13.     While Defendant profits handsomely from the unauthorized sale and disclosure of its customers' PII, they do so at the expense of its customers' privacy and statutory rights because Defendant do not provide its customers any notice, nor does it obtain its customers' consent, before selling their PII.

## PARTIES

14.     Plaintiff Lois Piper is a natural person and citizen of the State of Virginia. Plaintiff Piper has made purchases at Talbots retail stores in Virginia. Every time Plaintiff Piper made a purchase at a Talbots retail store in Virginia, the cashier requested her PII, including her name and address, which Plaintiff Piper provided. Prior to and at the time she made purchases at Talbots retail stores in Virginia, Defendant did not notify Plaintiff Piper that it sells the PII of its customers, and Plaintiff Piper has never authorized Defendant to do so. Furthermore, Plaintiff Piper was never provided any written notice that Defendant sells its customers' PII, or any means of opting out. Since making purchases at Talbots, and continuing to present, Defendant sold, and continues to sell, without consent or prior notice, Plaintiff Piper's PII to data mining companies including Wiland Direct and others, who then supplement that information with data from their own files. Moreover, during that same period, Defendant sold – and continues to sell and offer for sale – mailing lists containing Plaintiff Piper's PII to third parties seeking to contact Talbots customers, without first obtaining Plaintiff Piper's consent or even giving her prior notice of the disclosure and sales. Because Defendant sold her PII, Plaintiff Piper now receives junk mail and telephone solicitations. These unwarranted offers waste Plaintiff Piper's time, money, and resources. These harassing junk mail offerings and phone call solicitations received by Plaintiff

Piper are attributable to Defendant's unauthorized sale of her PII.  Because Plaintiff Piper is entitled by law to privacy in her PII, and because she paid money for her purchases at Talbots, Defendant's sale of her PII deprived Plaintiff Piper of the full set of benefits to which she was entitled as a part of her Talbots purchases, thereby causing economic harm.  Accordingly, what Plaintiff Piper received (a purchase without statutory privacy protections) was less valuable than what she paid for (a purchase with accompanying statutory privacy protections), and she would not have been willing to pay as much, if at all, for her Talbots purchases had she known that Defendant would sell her PII.

15.    Plaintiff Brenda Ruark is a natural person and citizen of the State of Virginia. Plaintiff Ruark has made purchases at Talbots retail stores in Virginia.  Every time Plaintiff Ruark made a purchase at a Talbots retail store in Virginia, the cashier requested her PII, including her name and address, which Plaintiff Ruark provided.  Prior to and at the time she made purchases at Talbots retail stores in Virginia, Defendant did not notify Plaintiff Ruark that it sells the PII of its customers, and Plaintiff Ruark has never authorized Defendant to do so. Furthermore, Plaintiff Ruark was never provided any written notice that Defendant sells its customers' PII, or any means of opting out.  Since making purchases at Talbots, and continuing to present, Defendant sold, and continues to sell, without consent or prior notice, Plaintiff Ruark's PII to data mining companies including Wiland Direct and others, who then supplement that information with data from their own files.  Moreover, during that same period, Defendant sold – and continues to sell and offer for sale – mailing lists containing Plaintiff Ruark's PII to third parties seeking to contact Talbots customers, without first obtaining Plaintiff Ruark's consent or even giving her prior notice of the disclosure and sales.  Because Defendant sold her PII, Plaintiff Ruark now receives junk mail and telephone solicitations.  These unwarranted offers waste Plaintiff Ruark's time, money, and resources.  These harassing junk mail offerings

and phone call solicitations received by Plaintiff Ruark are attributable to Defendant's unauthorized sale of her PII.  Because Plaintiff Ruark is entitled by law to privacy in her PII, and because she paid money for her purchases at Talbots, Defendant's sale of her PII deprived Plaintiff Ruark of the full set of benefits to which she was entitled as a part of her Talbots purchases, thereby causing economic harm.  Accordingly, what Plaintiff Ruark received (a purchase without statutory privacy protections) was less valuable than what she paid for (a purchase with accompanying statutory privacy protections), and she would not have been willing to pay as much, if at all, for her Talbots purchases had she known that Defendant would sell her PII.

16.     Defendant The Talbots, Inc. is a Delaware corporation with its principal place of business at 175 Beal Street, Hingham, MA 02043.  Defendant does business throughout Virginia, Massachusetts, and the entire United States.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

18.     This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within Massachusetts, such that Defendant has significant, continuous, and pervasive contacts with the State of Massachusetts.  Additionally, Defendant's principal place of business is in Hingham, Massachusetts.

19.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District, a substantial part of the events giving rise to Plaintiffs'

claims took place within this judicial District, and Defendant's principal place of business is in this District.

## **FACTUAL BACKGROUND**

### *The Personal Information Market:  Consumers' Personal Information Has Real Value*

20.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[5]

21.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[6]

22.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[7]

---

[5] The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 15, 2015).

[6] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 15, 2015).

[7] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf  (last visited July 15, 2015) (emphasis added).

23.     In fact, an entire industry exists where companies known as data miners purchase, trade, and collect massive databases of information about consumers.  Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[8]

24.     The scope of data miners' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[9]

25.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[10]

26.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi- Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[11]

---

[8] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 15, 2013).

[9] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited May 12, 2015).

[10] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 15, 2015).

[11] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012),

27.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data
> brokers have developed hidden dossiers on every U.S. consumer.
> This large[-]scale aggregation of the personal information of
> hundreds of millions of American citizens raises a number of
> serious privacy concerns.[12]

28.     Data mining is especially troublesome when consumer information is sold to

direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers

often use consumer information to lure unsuspecting consumers into various scams,[13] including

fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Defendant

share information with data miners and direct-mail advertisers, they contribute to the "[v]ast

databases of names and personal information" that are often "sold to thieves by large publicly

traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers"

and other criminals.[14]

29.     Information disclosures like Defendant's are particularly dangerous to the

elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are

often at home, rely on delivery services, and are lonely for the companionship that telephone

---

http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-
brokers-about-practices-involving-consumers-personal-information (last visited July 15, 2015).

[12] *Id.*

[13] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-
scams (last visited July 15, 2015).

[14] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007,
*available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0
(last visited July15, 2015).

callers provide."[15]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[16]

30.     Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[17]

31.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### *Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases*

32.     As the data mining industry has grown, so too have consumer concerns regarding the privacy of their personal information.

33.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they

---

[15] *Id.*

[16] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 15, 2015).

[17] *See id.*

believe do not protect their privacy online.[18]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[19]

34.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

35.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[20]

36.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace:  consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[21]

37.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[22]  As such, where a

---

[18] *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe, http://www.truste.com/us-consumer-confidence-index-2013/ (last visited July 15, 2015).

[19] *Id.*

[20] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 15, 2015).

[21] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 15, 2015).

[22] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at*

business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### Defendant Unlawfully Sells Its Customers' PII

38.     Every time a customer makes a purchase at a Talbots retail store in Virginia, the cashier requests that the customer provide her PII, including her name and address.

39.     Using that information, Defendant maintains a vast digital database comprised of their customers' PII.  Defendant sells their customers' PII to data mining companies including Wiland and others, who then supplement that information with additional sensitive personal information about each Talbots customer, including gender, purchasing habits, and charitable donations.  (*See, e.g.*, **Exhibits A-B**).

40.     Defendant then sells their mailing lists—which include customers' PII, and can include the sensitive information obtained from data miners—to data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits A–B**).

41.     As a result of Defendant's data compiling and sharing practices, companies can purchase mailing lists from Defendant that identify Talbots customers by their most intimate details:  income, political affiliation, religious practice, and charitable donations.  Defendant's sale of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Talbots will sell—to anyone willing to pay for it— list with the names and addresses of all Talbots customers who are

---

http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 15, 2015) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

wear size 4, made purchases over $100, and have a history of charitable donations.

42.      Defendant does not seek its customers' prior consent to any of these sales, nor does it notify its customers about these sales.  Thus, its customers remain unaware that their PII and other sensitive personal information is being bought and sold on the open market.

43.      As a result, Defendant sold and continues to sell their customers' PII – including their purchasing habits and preferences – to anybody willing to pay for it.

44.      By and through these actions, Defendant has intentionally sold to third parties their Virginia customers' PII without consent or notice, in direct violation of the VPIPA with respect to Plaintiffs and other members of the Class.

## CLASS ACTION ALLEGATIONS

45.      Plaintiffs seek to represent a class defined as all Virginia residents who had their PII sold to third parties by Defendant (the "Class").  Excluded from the Class is any entity in which Defendant have a controlling interest, and officers or directors of Defendant.

46.      Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

47.      Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Defendant obtained consent before selling to third parties Plaintiffs' and the Class's PII; (b) whether Defendant provided notice before selling to third parties Plaintiffs' and the Class's PII; (c) whether Defendant's sale of Plaintiffs' and the Class's PII violated the Personal Information Privacy Act, Va. Code §§ 59.1-442, *et seq.*; and (d)

14

whether Defendant's sale of Plaintiffs' and the Class's PII constitutes unjust enrichment.

48.     The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's sale of Plaintiffs' and the Class's PII.

49.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

50.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation of the Personal Information Privacy Act
### (Va. Code §§ 59.1-442, *et seq.*)

51.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

52.     Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant.

53.     Defendant is a "merchant" as that term is defined in the VPIPA.  *See* Va. Code § 59.1-442(A)-(B).

54.     Plaintiffs made purchases at Talbots retail stores in Virginia.

55.     At all times relevant, and beginning on the dates Plaintiffs made their purchases at Talbots retail stores in Virginia, Defendant sold Plaintiffs' PII, which identified them as Talbots customers, in at least two ways.

56.     First, Defendant sold mailing lists containing Plaintiffs' PII to data mining companies including Wiland, and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Defendant.

57.     Second, Defendant sold its mailing lists containing Plaintiffs' PII—enhanced with additional information from data miners—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

58.     Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Defendant was able to increase their profits gained from the mailing list sales.

59.     By selling their customer lists, Defendant sold to third persons information which concerns the purchaser and which was gathered in connection with the sale, rental or exchange of tangible personal property to the purchaser the merchant's place of business.  *See* Va. Code § 59.1-442(A).

60.     The information Defendant sold indicates Plaintiffs' names and address, as well

16

as the fact that they made purchases at Talbots retail stores.  Accordingly, the records or information sold by Defendant indicate Plaintiffs' identity.  *See* Va. Code § 59.1-442(A).

61.     Plaintiffs and the members of the Class never consented to Defendant selling their PII to anyone.

62.     Worse yet, Plaintiffs and the members of the Class did not receive notice before Defendant sold their PII to third parties.

63.     The information sold by Defendant was not gathered for purposes of extending credit and was not gathered for the purposes of the recording and sale, rental, exchange or disclosure to others of information obtained from any public body as defined in the Virginia Freedom of Information Act, Va. Code §§ 2-2-3700, *et seq.*

64.     Defendant's sales of Plaintiffs' and the Class's PII were not made pursuant incidental to the sale or other disposition of accounts receivable.

65.     Defendant's sales of Plaintiffs' and the Class's PII were not made in conjunction with check validation transactions.

66.     Defendant's sales of Plaintiffs' and the Class's PII were not made in connection with any sale by Defendant of their retail operations at one or more locations.

67.     Defendant's sales of Plaintiffs' PII were made to data miners, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Defendant's revenue.

68.     By selling Plaintiffs' PII, Defendant violated Plaintiffs' and the Class's statutorily-protected right to privacy under the VPIPA.  *See* Va. Code §§ 59.1-442, *et seq.*

69.     Additionally, because Plaintiffs and the members of the Class paid for their Talbots purchases, and Defendant was obligated to comply with the VPIPA, Defendant's unlawful sale of Plaintiffs' and the other Class members' PII deprived Plaintiffs and the Class

members of the full value of their paid-for Talbots purchases.  Because Plaintiffs and the other

Class members ascribe monetary value to the privacy of their PII, Defendant's unlawful sale of

their PII caused them to receive less value than they paid for, thereby causing them economic

harm.

70.     Likewise, because Plaintiffs and the other Class members ascribe monetary value

to the privacy of their PII, a Talbots purchase that keeps their PII private is more valuable than

one that does not.

71.     Accordingly, had Plaintiffs been adequately informed of Defendant's data sales

practices, they would not have been willing to make their Talbots purchases at the price charged,

if at all.  Thus, Defendant's unlawful sales caused Plaintiffs economic harm.

72.     Defendant's sale of Plaintiffs' PII to third parties has also caused an influx of

third party print advertisements and marketing calls to their cellular phones.

73.     As a result of Defendant's unlawful and continued disclosure of their PII,

Plaintiffs and the members of the Class have suffered privacy and economic injuries.  On behalf

of themselves and the Class, Plaintiffs seek:  (1) an injunction requiring Defendant to provide

notice and/or obtain consent from Virginia customers prior to the disclosure of their PII as

required by the VPIPA; (2) damages in the amount of $100 per violation, per Class member

pursuant to Va. Code § 59.1-444; and (3) costs and reasonable attorneys' fees pursuant to Va.

Code § 59.1-444.

## COUNT II
### Unjust Enrichment
### (Brought Pursuant to Virginia Law)

74.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set

forth herein.

18

75.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendant.

76.     Plaintiffs and the Class members conferred benefits on Defendant by providing Defendant with their PII and paying Defendant for their Talbots purchases.  Defendant received and retained the information and money belonging to Plaintiffs and the Class when Plaintiffs and the Class made their Talbots purchases.

77.     Because Defendant received and processed Plaintiffs' and the Class's payments and PII, and because Defendant has employees handling customer accounts and billing as well as customer data, Defendant appreciates or has knowledge of such benefits.

78.     Under the VPIPA, Plaintiffs and the Class members were entitled to confidentiality in their PII as part of their Talbots purchases.

79.     Under principles of equity and good conscience, because Defendant failed to comply with the VPIPA, Defendant should not be allowed to retain the full amount of money Plaintiffs and the Class paid for their Talbots purchases or the money they received by selling Plaintiffs' and the Class's PII.

80.     Plaintiffs and the other Class members have suffered actual damages as a result of Defendant's unlawful conduct in the form of the value Plaintiffs and the other Class members paid for and ascribed to the confidentiality of their PII.  This amount is tangible and will be calculated at trial.

81.     Additionally, Plaintiffs and the Class members have suffered actual damages inasmuch as Defendant's failure to inform them that they would sell their PII caused them to make purchases at Talbots retail stores in Virginia when they otherwise would not have.

82.     Further, a portion of the purchase price of each Talbots product sold to Plaintiffs and the other Class members was intended to ensure the confidentiality of Plaintiffs' and the

other Class members' PII, as required by the VPIPA. Because Plaintiffs and the other Class

members were denied services that they paid for and were entitled to receive—i.e.,

confidentiality of their PII—and because Plaintiffs and the Class would have commanded a

discount to voluntarily forego those benefits, they incurred actual monetary damages.

83.    To prevent inequity, Defendant should return to Plaintiffs and the Class the value

they ascribe to confidentiality of their PII and all money derived from Defendant's sale of

Plaintiffs' and the Class's PII.

84.    Accordingly, Plaintiffs and the Class members seek an order declaring that

Defendant's conduct constitutes unjust enrichment, and awarding Plaintiffs and the Class

restitution in an amount to be calculated at trial equal to the amount of money obtained by

Defendant through its sale and disclosure of Plaintiffs' and the Class's PII.

## PRAYER FOR RELIEF

85.    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly

situated, seek a judgment against Defendant as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class.

B.    For an order declaring that Defendant's conduct as described herein violates the Personal Information Privacy Act, Va. Code § 59.1-442;

C.    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D.    For an award of damages, in the amount of $100 per violation, to Plaintiffs and each Class member, as provided by the Personal Information Privacy Act, Va. Code § 59.1-444;

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem proper; and;

H.    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated:  June 3, 2020

Respectfully submitted,

**BIRNBAUM & GODKIN, LLP**

*/s/ David S. Godkin*
David S. Godkin (BBO#196530)
James E. Kruzer (BBO #670827)
470 Atlantic Avenue, 4th Floor
Boston, MA  02210
Tel: (617) 307-6110
godkin@birnbaumgodkin.com
kruzer@birnbaumgodkin.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro Hac Vice*)
Philip L. Fraietta *(Pro Hac Vice)*
888 Seventh Avenue
New York, NY  10019
Tel: (646) 837-7150
Fax: (212) 989-9163
jarisohn@bursor.com
pfraietta@bursor.com

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I, David S. Godkin, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 3, 2020.

*/s/ David S. Godkin*
David S. Godkin