UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LOIS PIPER, *et al*.,                          )
                                               )
            Plaintiffs,                        )
v.                                             )            No. 1:20-cv-10297-NMG
                                               )
THE TALBOTS, INC.,                             )
                                               )
            Defendant.                         )

**THE TALBOTS, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT**

## I.    Introduction

Plaintiffs' Opposition relies on speculation and conjecture, but fails to identify a single fact in the FAC to suggest that Talbots sold *their* information to a third party in violation of the Virginia Personal Information Privacy Act ("VPIPA").  While Plaintiffs insist that two screenshots from a third-party, NextMark, suffice to state a claim, they flip flop and rely on a string of assumptions:

(a) That, contrary to the allegations of the FAC, NextMark is a data broker that connects sellers (allegedly Talbots) and buyers;

(b) That a third-party actually purchased Plaintiffs' information;

(c) That Talbots was the source of the data purely because screenshots on NextMark's website use Talbots' name;

(d) That the purchased data was gathered during an in-store transaction in Virginia, and not, for example, in conjunction with online purchases, catalog purchases, rewards programs, store credit cards, and/or purchases made outside of Virginia; and

(e) That, as to the Wiland screenshot: (1) NextMark obtained the information from Wiland; and (2) Talbots sold the information to Wiland even though Plaintiffs acknowledge that Wiland is a cooperative where businesses share (rather than sell) customer data.

Plaintiffs argue that the NextMark screenshots are "documented evidence" that "leave little doubt" that their assumptions are true.  Opp. at 1, 4.  This is wishful thinking.  The screenshots do not even address *in-store* transactions (required to trigger a violation), let alone indicate that Plaintiffs' information was sold, or even ever offered for sale.

Where, as here, "a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell A. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Plaintiffs' chain of assumptions falls far short of what *Iqbal* and *Twombly* require.  Even

after their second bite at the apple, Plaintiffs are still unable to plead facts sufficient to state a cause of action. Accordingly, this Court should dismiss Plaintiffs' FAC with prejudice.

## II.     Plaintiffs Do Not State a VPIPA Claim

### A.     Plaintiffs Have Not Identified Any Facts to Plausibly Suggest their Information Was Gathered During an In-Store Purchase in Virginia

Plaintiffs' Opposition implicitly recognizes that their VPIPA claim will ultimately require findings that the information allegedly sold was collected in-store. VA Code Ann. § 59.1-442 (restricting the sale of data "gathered in connection with the sale, rental or exchange of tangible personal property to the purchaser at the merchant's place of business."). Nevertheless, the FAC does not allege that Talbots recorded their information in-store.[1] Instead, they ask the Court to infer that it was recorded by Talbots, and that the information had not been gathered prior to in-store transaction(s) in Virginia.

Retailers can obtain customer information in a variety of contexts, including online purchases, catalogue purchases, rewards programs, store credit cards, and purchases made outside of Virginia. Motion at 8-9. If Talbots gathered Plaintiffs' information in one of these contexts—rather than during an in-store purchase in Virginia—the VPIPA simply does not apply. Plaintiffs nevertheless ask the Court to ignore the multitude of other ways information can be gathered and to assume their information was gathered in store, despite no supporting facts. Opp. at 4. However, *Iqbal* and *Twombly* make clear that, "[w]hen faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with

---

[1] Talbots made this same argument in its first motion to dismiss, and while Plaintiffs opted to amend their complaint rather than oppose that motion, they still failed to add this crucial allegation despite their opportunity to "easily amend to note that they saw the cashiers typing in the PII that they provided." Opp. at 4. It is reasonable to infer that Plaintiffs have no facts to support an allegation that Talbots recorded their information in store. .

the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible." *In re Cent. Aluminum Co. Securities Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citing *Iqbal* and *Twombly*).

Similarly, Plaintiffs offer no factual basis on which to believe that Talbots re-collected their personal information every time they visited the store. Plaintiffs argue that it is unbelievable that a retailer would just look up a customer's information during a transaction. Opp. at 4 ("While Defendant appears to suggest that Plaintiffs provided their PII only for their words to disappear, unrecorded, into the ether, that is obviously not believable.") But Talbots' explanation, that its sales clerks simply confirm existing information, is not implausible.[2] *Iqbal*, 556 U.S. at 679 ("determining whether a complaint states a plausible claim … require[es] the reviewing court to draw on its experience and common sense.") (citation omitted). Retailers routinely look up customer's profiles during the check-out process. *See, e.g.*, *Gass v. Best Buy Co., Inc.*, 279 F.R.D. 561, 566 (C.D. Cal. 2012) (noting, "[t]he information used to look up a Reward Zone member is not recorded.").[3] Plaintiffs themselves allege that Talbots maintains a "[v]ast database[] of names and personal information" (FAC ¶ 28), and that retailers have a financial interest in updating customers' information because "[u]p-to-date PII is far more valuable to marketers than stale data" (Opp. at 5 n.1). It would not be efficient for busy store clerks to re-key the same information anew every time a customer returns to a store. Rather, logic dictates that Talbots would look up the information already on-file, confirm its accuracy, and update it only if needed.

---

[2] Plaintiffs' Opposition repeatedly argues that the VPIPA broadly applies to "information which concerns the purchaser," not just names and addresses. *See* Opp. at 6, 8 n.2. This is irrelevant, because Plaintiffs have only contended that they only shared, and Talbots only sold, their names and addresses.

[3] Moreover, to the extent Plaintiffs claims that Talbots tracks and sells all of the information on the NextMark screenshots, such as "average purchase," Talbots would have to track customers' data across purchases in a single file.

3

**B.**     **Plaintiffs' Opposition Identifies No Factual Support to Show That Plaintiffs' Information Was Ever Sold to a Third Party**

Plaintiffs' FAC alleged that Talbots must have sold their information because they have received lots of junk mail and unsolicited calls. Yet Plaintiffs' Opposition has abandoned this theory.  Instead, Plaintiffs reflexively assume "because Plaintiffs both shopped at Talbots and provided their PII to Talbots cashiers on multiple occasions, it is highly probable their PII were included in its sales through Nextmark."  Opp. at 11.  Even if Plaintiffs could plausibly allege that Talbots recorded their information, and that Talbots sold certain customer information to third parties—which Talbots do not—the FAC alleges no facts to support their assumption that any data sold included these Plaintiffs' information.

The NextMark screenshots do not support their argument, either. The NextMark screenshots do not offer to sell in-store customers' names or addresses—which are the *only* two categories of their information they claim Talbots offered for sale.  FAC ¶¶ 14-15, 38, 60. Plaintiffs conclude that NextMark must have sold customers' addresses because the headings on the NextMark listings include the phrase "Talbots Mailing List."  Opp. at 6.  In the age of e-commerce, however, the term "mailing list" could just as easily refer to email addresses.  Indeed, under the "ADDRESSING" heading on each screenshot, there is a line item for "EMAIL."  The only reference to postal address clearly concerns online purchasers: "INTERNET BUYERS AT POSTAL ADDRESS."  Plaintiffs argue that this must mean that addresses for in-store customers must also be for sale, because "there would be no need to separately identify online purchasers if the lists were limited to online purchasers."  Opp. at 6.[4]  This logic might hold water if the menu

---

[4] Plaintiffs also argue, "The Nextmark lists also leave little doubt that the PII was gathered during retail transactions because they include data on amounts spent (e.g. "$100+ BUYERS") and the nature of the products purchased (e.g. "PRODUCT" and "SIZE")."  Opp. at 4.  While NextMark's one-word descriptions are insufficient to ascertain the precise data being sold, "amounts spent" and "nature of products purchased" would apply just as easily to online purchases as in-store purchases.

of selections offered "in-store customers at postal address" or even "address," but it does not.

Moreover, nothing in the screenshot indicates that the mailing lists include the information of any customers other than those who expressly agreed to share their information. Plaintiffs respond that the lists must include customers who did not consent, because "Plaintiffs both allege that they were never notified about Defendant's practice of selling consumers' PII." Opp. at 5. This reasoning is circular: Plaintiffs have not alleged facts to show that their information is on any list.

Plaintiffs also have not provided a basis on which the Court could infer that a third party actually purchased Plaintiffs' data. According to the FAC, data buyers make highly tailored requests so that they can target very specific customers. For example, Plaintiffs allege, "a purchaser could buy a list with the names and addresses of all Talbots customers who wear size 4 and made purchases over $100." FAC ¶¶ 12, 41. For this example, Plaintiffs would not have a claim unless they wear a size 4 and spent over $100—otherwise, their information would not have been purchased.

Finally, Plaintiffs have ignored all of the authority cited by Talbots where conclusory allegations of data disclosures, such as those noted above, have resulted in dismissal. Motion at 7 and fn. 7.

### C. Plaintiffs Fail to Allege Plausible Facts that Talbots Is the Source of the Information on the NextMark Website

#### 1. The NextMark Exhibits Do Not Suggest Talbots Sold Customer Information

Although the FAC repeatedly alleges that NextMark sells Talbots' customer information, Plaintiffs now admit that this is incorrect. *Compare* Opp. at 9 ("[NextMark] is not a direct party to the sale of PII") *with* FAC ¶ 1 ("NextMark, Inc. … sold [Talbots's customers'] information to telemarketers and other aggressive advertisers."). Instead, Plaintiffs now argue that NextMark is

5

a "data broker"—meaning that it connects buyers and sellers of data.  Plaintiffs claim "there is little doubt that Talbots is the source of this data" merely because the word "our" and a Talbots logo appear in NextMark's listing.  Opp. at 5.  To be clear, however, the listing does not state that the information is being sold by Talbots.  The fact that NextMark's website purports to broker the sale of Talbots's customer information does not mean that Talbots is selling information.

### 2.     Plaintiffs' Wiland Theory Makes their Case Even Weaker

Plaintiffs make much of the fact that Exhibit B to the FAC lists data allegedly collected from Wiland, a data cooperative of which Plaintiffs claim Talbots is a member.  *See, e.g*., Opp. at 1, 9.  Even if this allegation were true, however, it would not help Plaintiffs cure any of the deficiencies above.  As discussed throughout Talbot' Motion, the FAC does not allege any facts to support Plaintiffs' "boilerplate" allegations that Talbots sold their data to third parties including data miners, which Plaintiffs claim includes Wiland.  *See, e.g.*, Motion at 2.

If the data discussed in Exhibit B actually came from Wiland, this would hurt Plaintiffs' claims, as Wiland is a further link distancing Talbots from the alleged sale of any information: Wiland, not Talbots, would be the party selling data on NextMark. Wiland, not Talbots, would have provided the "sensitive information" being sold. *See also* Opp. at 9-10 (alleging that Wiland "supplement[ed]" Talbots mailing list with "sensitive personal information about each Talbots customer, including gender, purchasing habits, and charitable donations.").

Plaintiffs also do not allege facts to support their claim that Talbots "sold" its data to Wiland.  Opp. at 9-10.  They argue that Wiland is a data cooperative, but this allegation—i.e., Talbots and other alleged Wiland members share their data with each other—does not support a claim that Talbots sold its data to anyone.  The common meaning of "sale" requires an exchange of something for money.  *See* Oxford Dictionary, SELL ("1. Give or hand over (something) in

6

exchange <u>for money</u>.") (emphasis added), *available at* https://www.lexico.com/en/definition/sell.[5]

If the Legislature did not intend to limit the statute to data sold for money, it could have followed

the path of other laws and used the verb "disclose" instead. *See, e.g.* Mich. Comp. Laws Ann. §

445.1712 ("a person … shall not knowingly <u>disclose</u> to any person, other than the customer, a

record or information that personally identifies the customer…"); 18 U.S. Code § 2710(b)(1) ("A

video tape service provider who knowingly discloses, to any person, personally identifiable

information concerning any consumer of such provider shall be liable…").

### 3.    The Court Should Follow *Wheaton*, not *Horton*

Plaintiffs claim that numerous courts have rejected the "the exact same arguments

regarding NextMark mailing lists." Not so. Only one of the cases cited by Plaintiffs, *Horton v.*

*GameStop Corp*., 380 F. Supp. 3d 679 (W.D. Mich. 2018), considered whether Nextmark

screenshots are sufficient to state a claim under the privacy statute at issue (there, under Michigan

law).[6] *Horton* did not involve the information of in-store customers. Instead, the plaintiffs there

alleged that GameStop unlawfully sold the mailing list of the subscribers to its video-game

magazine, <u>Game Informer</u>. This distinction is significant, as lists of magazine subscribers

necessarily include the exact information that the plaintiffs in *Horton* claimed GameStop

---

[5] *See also* Black's Law Dictionary (11th ed. 2019): sale *n.* (bef. 12c) ("1. The transfer of property or title for a price. *See* UCC § 2-106(1). 2. The agreement by which such a transfer takes place. • The four elements are (1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price <u>in money</u> paid or promised.") (emphasis added); *Geoghegan Sons & Co. v. Arbuckle Bros.*, 139 Va. 92, 112 (1924) ("A sale may be defined as the transfer of the title of a chattel from seller to buyer by a contract whose consideration is a price in money.")

[6] Plaintiffs also cite a number of other magazine cases that are distinguishable for the same reasons. These other decisions do not address any of the arguments in Talbots' motion. *Boelter v. Hearst Commun., Inc*., 192 F. Supp. 3d 427, 454 (S.D.N.Y. 2016) (defendant primarily made a First Amendment challenge; only 12(b)(6) argument was that the Michigan law at issue did not apply to magazine subscriptions; no Rule 8 argument); *Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 590 (S.D.N.Y. 2016) (defendant made number of standing and First Amendment arguments, and claimed unjust enrichment claim was preempted; no Rule 8 argument); *Ruppel v. Consumers Union of United States, Inc*., 2017 WL 3085365, at *1 (S.D.N.Y. June 12, 2017) (same); *Perlin v. Time Inc*., 237 F. Supp. 3d 623, 641–42 (E.D. Mich. 2017) (publisher moved to dismiss for lack of subject matter jurisdiction and for failure to state an unjust enrichment claim); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D. Mich. 2017) (same).

disclosed:  consumers' names and addresses (which are required to deliver magazines), and information concerning the purchase of reading materials (which is inherent in the title of the magazine being delivered).  Unlike here, where the names and addresses of customers who like Talbots could come from any number of sources, actual lists of the names and addresses of magazine subscribers would most likely come from the magazine publisher itself.

Here, unlike in *Horton*, the FAC provides no basis on which the Court could infer that a list of information about Talbots customers definitively includes in-store customers' names and addresses—which are the only two categories of information that Plaintiffs claim Talbots disclosed. Again, nothing in the NextMark screenshots purports to disclose this information.  *See* Section II(B), *supra*.

Plaintiffs argue that *Wheaton* is distinguishable because it the *Wheaton* plaintiffs "offered screenshots … that were not anywhere close to as detailed" as Plaintiffs' exhibits here.  Opp. at 7.  While this may be true of one of the two screenshots in *Wheaton*, the other is similar to Plaintiffs' exhibits here.[7]  In fact, the *Wheaton* screenshot lists a number of categories of sensitive data not present in Plaintiffs' screenshots here, including age, education, gender, household income, marital status, and children.  *Id*.  Plaintiffs also argue the Court should not follow *Wheaton* because "[i]n *Wheaton*, the plaintiffs did not offer as exhibits anything from NextMark."  Opp. at 1, 7.  This appears to be incorrect.  The *Wheaton* screenshot lists NextMark as the apparent source of the data (on the right-hand side, under "ID Number").  Plaintiffs also argue that the less detailed screenshot in *Wheaton* did not have a heading identifying Apple or iTunes.  Opp. at 7 ("Another exhibit 'fail[ed] to mention the third-party data broker name, Apple, or even iTunes.'").  This is irrelevant.

---

[7] Given that Plaintiffs' argument is based on the content of the two screenshots in *Wheaton*, Talbots attaches the more detailed screenshot here for the Court's convenience.  The screenshot is pulled directly from Pacer.  *See* Exhibit C to Complaint, *Wheaton v. Apple Inc*., Case No. 3:19-cv-02883-WHA, Dkt. No 1-3 (N.D. Cal, May 24, 2019).

For the *Wheaton* screenshot attached hereto, the heading reads: "iTunes and Pandora Music Purchasers." Thus, by granting Apple's motion to dismiss, the *Wheaton* court rejected Plaintiffs' argument here that a screenshot's reference to a retailer's customers "leav[es] no doubt that the exhibits pertain to [the retailer's] customers." Opp. at 8.

## III.    Plaintiffs Cannot State A Claim for Unjust Enrichment Because They Have Not Alleged That They Lack an Adequate Remedy at Law

Plaintiffs rely on two unpublished district court decision to support their claim that they can seek unjust enrichment in the alternative to damages under Section 93A. Opp. at 11-12. The First Circuit has repeatedly rejected this argument. *Shaulis v. Nordstrom*, 865 F.3d 1, 16 (1st Cir. 2017) ("Although Shaulis argues that, if her other claims are dismissed, she effectively has no adequate remedy, this argument misapprehends the relevant law. It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment."); *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 69 (1st Cir. 2020) (plaintiffs with "an adequate remedy at law cannot maintain a parallel claim for unjust enrichment, even if that remedy is not viable.") (quoting *Tomasella v. Nestle USA, Inc.*, 364 F. Supp. 3d 26, 37 (D. Mass. 2019)); *see also Pershouse v. L.L. Bean, Inc.*, 368 F. Supp. 3d 185, 190 (D. Mass. 2019). Plaintiffs' unjust enrichment claim should be dismissed.

## IV.    Conclusion

Plaintiffs' Opposition does not identify any new facts to support Plaintiffs' claims to save their case. Talbots respectfully requests that this Court dismiss Plaintiffs' FAC with prejudice.

Dated: July 27, 2020                                Respectfully submitted,


                                                    THE TALBOTS, INC.

                                                    By:    */s/ Stacy O. Stitham*
                                                           One of its attorneys

9

Peter J. Brann (BBO #054190)
pbrann@brannlaw.com
Stacy O. Stitham (BBO #663229)
BRANN & ISAACSON
184 Main St., 4th Floor
Lewiston, ME 04243-3070
Tel: (207) 786-3566

Anthony J. Anscombe (admitted *pro hac vice*)
aanscombe@steptoe.com
STEPTOE & JOHNSON LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Tel: (312) 577-1300

Stephanie A. Sheridan (admitted *pro hac vice*)
ssheridan@steptoe.com
Meegan B. Brooks
mbrooks@steptoe.com (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1 Market Street
Spear Tower, Suite 3900
San Francisco, CA 94015
Tel: (415) 365-6700

*Counsel for Defendant The Talbots, Inc.*

10